BAKER & HOSTETLER LLP
John Siegal
Tiffany A. Miao
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Email: jsiegal@bakerlaw.com
Email: tmiao@bakerlaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTREPID FINANCIAL PARTNERS, LLC, Plaintiff, -v.- ANTONIO C. FERNANDEZ, Defendant. | Case No.: |

I, **CHRISTOPHER F. WINCHENBAUGH**, declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am Co-Founder, President and Chief Operating Officer of Intrepid Financial Partners ("Intrepid"). I make this declaration to submit to the Court the facts warranting entry of a temporary restraining order to specifically enforce Intrepid's Non-Competition and Confidentiality Agreement ("Agreement") with the defendant Antonio Fernandez, so that the status quo can be preserved and the rights and obligations of the parties can be determined in an arbitration before the Financial Industry Regulatory Authority ("FINRA"), or if FINRA declines, the American Arbitration Association, to which the parties agreed to in the Agreement. I have personal knowledge of the facts and circumstances set forth below.

2. Mr. Fernandez is currently employed with Intrepid through November 30, 2020, having previously provided a three-month notice of his resignation as required under the Agreement.

3. Throughout the notice period, Mr. Fernandez has refused to inform Intrepid management of his post-Intrepid employment plans. Only at the end of last week did Intrepid learn that, albeit through a public announcement in the news wires, Mr. Fernandez *and* his Intrepid colleague Robert Willis will be joining Citigroup, Inc. ("Citi") Acquisitions and Divestitures ("A&D") group, a business line that is in direct competition with Intrepid. Under these circumstances, Citi is now poised to compete for Intrepid's A&D clients and mandates, which Intrepid assigned to Mr. Fernandez to manage on its behalf and, at present, include certain valuable and time-sensitive A&D transactions pending in the market.

4. Intrepid is an independent merchant bank that provides a full complement of advisory and investment services and offers strategic mergers and acquisitions, asset acquisition and divestiture, as well as restructuring advisory services plus access to investment opportunities across the spectrum of private equity, mezzanine and distress situations. Intrepid focuses on the U.S. energy sector only. Intrepid does not conduct business with or advise companies outside of the U.S. energy sector.

5. Intrepid maintains offices in New York City and Houston, Texas.

6. In my role, I work closely with Hugh "Skip" McGee, Co-founder and Intrepid's Chief Executive Officer. We are jointly responsible for every aspect of Intrepid's business. Additionally, each of Intrepid's 47 employees, located across both offices, report directly to both of us.

**Intrepid's Founding, Its A&D Business, And The Energy Sector**

7.  Intrepid was founded by Mr. McGee and myself in 2015. Mr. McGee spent over 20 years at Lehman/Barclays, and up until founding Intrepid, served as CEO of Barclays in the Americas. I also spent 20 years at Lehman/Barclays and served as COO of Barclays Americas.

8.  Mr. McGee and I founded Intrepid because we recognized the opportunity to service the energy market given the new technologies and geopolitical factors that emerged five years ago. With our combined decades of experience in advisory and investment services, including business connections and relationships, we founded Intrepid with the explicit intention of attracting market-leading clients and hiring top talent to service those clients.

9.  Through our prior experience, roles, and established relationships in the industry, Mr. McGee and I have been able to attract, develop, and maintain successful relationships with Intrepid clients. As such, in 2018, Mr. McGee and I decided to expand Intrepid's business to include an A&D group, so that Intrepid could offer A&D services to its clients.

10.  Acquisitions and Divestitures is a unique business line in the energy sector, since its sole focus is on the geological, geotechnical and engineering evaluation of, and valuation of, energy assets in general, and, usually, oil and gas assets in particular.

11.  Specifically, members of A&D teams are usually trained petroleum engineers, geologists and geophysicists, virtually all of whom have advanced science or technical degrees in their area of specialty, and virtually all of whom have spent time working in the energy industry for large energy companies.

12.  A&D teams generally use specialized software, mapping programs, and hardware unique to the evaluation of oil and gas assets. The specific skills that members of A&D teams have developed and utilize are only of value to firms that are involved in the energy industry, and

3

are of no value to a financial services firm unless that firm covers the energy sector and intends to pursue A&D transactions.

13. In July of 2018, Mr. McGee and I hired Mr. Fernandez to lead Intrepid's A&D group.

**Why We Hired Mr. Fernandez And His Role At Intrepid**

14. Mr. Fernandez is currently one of Intrepid's senior executives.  Mr. Fernandez joined Intrepid in 2018 as Managing Director and Intrepid's Head of Acquisitions & Divestitures ("A&D").  Mr. Fernandez reports directly to Mr. McGee and me.

15. Prior to joining Intrepid, Mr. Fernandez was a senior A&D banker at JP Morgan and Jefferies with approximately four years of banking experience.  Prior to a career in banking, Mr. Fernandez spent approximately eight years in engineering roles at various energy companies.

16. At Intrepid, Mr. Fernandez supervises a team of three professionals: one engineer, Mr. Willis, and two geologists.  The team works on A&D matters for Intrepid clients that Intrepid management assigns to Mr. Fernandez and the A&D team.

17. Through managing A&D matters for Intrepid, Mr. Fernandez has interacted directly with the most senior officers of Intrepid's clients.  Mr. Fernandez has also acquired detailed information regarding Intrepid's clients, including existing and potential A&D customers, their transactions (past, present and anticipated), needs, financial resources, investment strategies, and business plans.  Mr. Fernandez's relationships with Intrepid clients were acquired after he joined the firm and developed with the firm's expenses and resources.

18. More specifically and highly relevant to the present circumstances, Mr. Fernandez currently manages certain valuable and time-sensitive A&D matters for long-term Intrepid clients.  Mr. McGee and I invested tremendous amounts of time and resources to bring these

clients to Intrepid.  The timing of Mr. Fernandez's departure from Intrepid and imminent employment to lead Citi's A&D group presents an unequivocal threat to Intrepid's current A&D business.

**Mr. Fernandez's Non-Compete and Confidentiality Agreement**

19. By letter dated July 24, 2018 ("Offer Letter"), Intrepid offered Mr. Fernandez his Managing Director position, with a start date of September 24, 2018.  Attached to the offer letter was a "Non-Competition and Confidentiality Agreement" (the "Agreement"), containing certain post-employment obligations.  A copy of the Offer Letter with the Agreement is attached as Exhibit A.

20. As described in the Offer Letter, Mr. Fernandez would be a full-time, salaried employee and outlined his substantial compensation package which included: a generous base salary, possible participation in Intrepid's profit sharing plan, a discretionary bonus and a "make whole bonus."  Exhibit A, at 1.

21. Among other things, the Agreement required that Mr. Fernandez provide three months' notice prior to leaving his position with Intrepid and that he would be bound to a six-month non-competition restriction.  Mr. Fernandez was compensated in consideration for agreeing to these provisions—he joined Intrepid in September 2018 and received a salary and bonus equivalent to a full year's compensation for the remaining months of 2018.

22. Mr. McGee and I were aware of the fact that employees will come and go, and we structured the Agreement with a three-month notice period and six-month non-compete to provide for an appropriate transition and replacement period.

23. Prior to accepting his offer, Mr. Fernandez and I had numerous discussions regarding the three-month notice period and six-month non-compete.  I explained to Mr.

Fernandez that given the compensation structure at Intrepid, as compared to other investment banks, these six-month post-employment restrictions are the only way for the firm to protect itself from employees leaving and immediately walking across the street to a competitor.

24. Mr. Fernandez signed both the offer letter and the Non-Competition and Confidentiality Agreement.  *See* Exhibit A.

25. The day after Mr. Fernandez signed the offer letter, in an e-mail to me dated July 25, 2018, Mr. Fernandez re-affirmed the "3 month notice period + 6 month non-compete."  A copy of Mr. Fernandez's July 25, 2018 email is attached as Exhibit B.

**Intrepid's Confidential and Proprietary Information**

26. In his role as a Managing Director and Head of A&D, Mr. Fernandez has had access to highly confidential and proprietary information concerning every aspect of Intrepid's A&D business line, its employees, customers and business strategy and Intrepid's operations, business activities, target markets, products, pricing formulae and business strategy.

27. Mr. Fernandez also played an active role working closely with Mr. McGee and me on Intrepid's long term business planning.

28. On a quarterly basis Mr. Fernandez participated in meetings with Mr. McGee, the heads of Intrepid's business units and me.

29. In advance of the meetings Mr. Fernandez both prepared and was provided with written business plans and other materials marked "Confidential" that contained detailed information concerning the activities and performance of every Intrepid business line, the various projects that Intrepid's business lines were involved in, and detailed information concerning Intrepid's assets and investments.

30. During the meetings the participants discussed Intrepid's past and projected financial performance, active client transactions, planned future transactions, and strategies for expanding Intrepid's business.

31. As a result of his broad access to information, Mr. Fernandez has intimate knowledge of dozens of currently active transactions, the performance of the firm, its advisory business, its investment business, and of course, the performance of the A&D team he manages.

32. Up to the date of this Declaration, Mr. Fernandez has been working on several critical projects for Intrepid clients. As a result, he has detailed knowledge concerning these clients' needs including their short- and long-term plans. The information he possesses concerning active projects, if shared with a competitor, would place Intrepid at a severe competitive disadvantage.

33. Intrepid's confidential and proprietary business information is not available to the public, is of great value to Intrepid, and would give any of its competitors who acquired such information an unfair competitive advantage.

**Mr. Fernandez's Resignation, Improper Solicitation Of Mr. Willis, And Their Imminent Departure To Citi's A&D Team**

34. On September 2, 2020, Mr. Fernandez called me to advise that he would be resigning from his employment with Intrepid. I asked him if he had accepted another job offer, and he said he did not have anything definitive.

35. During the September 2nd call, Mr. Fernandez noted that he decided to leave because of his compensation. I told him we should discuss his compensation and that if compensation was the issue, we could deal with that. I told him that I would follow up with Mr. McGee and that we should continue the conversation. He agreed.

7

36. After the September 2nd call, Mr. Fernandez sent me an e-mail attaching a written letter of resignation ("Resignation Letter").  A copy of the Resignation Letter is attached as Exhibit C.  In the letter, Mr. Fernandez referenced his "notice period" and requested a waiver of a portion of that notice period, without providing an explanation or basis for the request.

37. Over the next few weeks, Mr. Fernandez, Mr. McGee, and myself engaged in numerous conversations, via telephone, e-mail, and in-person, regarding whether Mr. Fernandez would consider staying at Intrepid in exchange for certain compensation enhancements.  These conversations continued, because Mr. Fernandez indicated that he would consider staying at Intrepid for an increase in compensation.

38. On September 21, 2020, Mr. McGee and I had a videoconference with Mr. Fernandez.  Mr. Fernandez stated that he still intended to resign and would not accept our offer.  He expressed willingness to discuss his transition.  We asked him where he was going, but he refused to tell us.

39. The next day, on September 22, 2020, I received a letter from an attorney purporting to represent Mr. Fernandez.  The letter challenged the enforceability of Mr. Fernandez's Agreement.

40. Given Mr. Fernandez's repeated refusal to reveal his future employment plans to Mr. McGee and me, I interpreted the challenge as an indication of Mr. Fernandez's intention to breach that Agreement.

41. On October 2, 2020, Mr. Willis emailed Mr. McGee and me with his letter of resignation.  Pursuant to his non-compete agreement, Mr. Willis' employment with Intrepid terminates on December 30, 2020.

42. On November 12, 2020, it was brought to Intrepid's attention from a few of its clients that Citi informed them that Mr. Fernandez would be leaving Intrepid and joining Citi.

43. On November 13, 2020, I found out by news release, that Mr. Fernandez and Mr. Willis would be joining Citi's A&D group.  Following this news, I spoke to Mr. Fernandez and Mr. Willis, separately, and each confirmed that they would be joining Citi.

44. Given the timing of Mr. Willis' termination of employment with Intrepid to join Citi's A&D team alongside Mr. Fernandez, I am concerned that Mr. Fernandez may have breached the non-solicitation provision in the Agreement by recruiting Mr. Willis to Citi.

45. As of the date of this Declaration, despite repeated inquiry, Mr. Fernandez has not informed Mr. McGee or me of when he intends to commence his employment at Citi.

46. As of the date of this Declaration, despite repeated inquiry, Mr. Willis has not informed Mr. McGee or me of when he intends to commence his employment at Citi.

47. Citi competes with Intrepid in the U.S. energy sector, and its A&D group is a direct competitor to Intrepid's A&D business.   Notwithstanding so, Citi has resources to employ over 200,000 individuals, whereas Intrepid has never had more than 50 employees.

48. Given that Citi and Intrepid are competitors, Mr. Fernandez is a specialist in the A&D market, and the specific nature of certain active and highly sought-after A&D projects and clients at Intrepid, the timing of Mr. Fernandez's and Mr. Willis' joint departure to Citi cannot be a coincidence.

49. Requiring Mr. Fernandez to comply with his post-employment obligations—a restraint of only six months—will allow Intrepid to continue servicing its clients as we transition to a replacement for Mr. Fernandez.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 19th day of November, 2020, in Houston, Texas.

*Christopher F. Winchenbaugh*
Christopher F. Winchenbaugh