# EXHIBIT 5

BAKER & HOSTETLER LLP
John Siegal
Tiffany A. Miao
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Email: jsiegal@bakerlaw.com
Email: tmiao@bakerlaw.com
*Attorneys for Claimant*

**FINRA DISPUTE RESOLUTION**

|  |  |
|---|---|
| INTREPID FINANCIAL PARTNERS, LLC, | FINRA Case No.: |
| Claimant, | |
| -v.- | |
| ANTONIO C. FERNANDEZ, | |
| Respondent. | |

**<u>STATEMENT OF CLAIM</u>**

1.     Claimant Intrepid Financial Partners, LLC ("Intrepid") brings this claim against its soon-to-be former employee, Antonio Fernandez, seeking to specifically enforce Mr. Fernandez's contractual post-employment non-competition, non-solicitation and confidentiality obligations to Intrepid, which he has breached or will breach upon commencing employment with Intrepid's direct competitor, Citigroup, Inc. ("Citi"), and to seek damages resulting from Mr. Fernandez's conduct.

2.     Mr. Fernandez is one of Intrepid's senior executives, serving since 2018 as Managing Director and Intrepid's Head of Acquisitions & Divestitures ("A&D") and reporting to the Chief Executive Officer and the President and Chief Operating Officer, who are the firm's co-founders.  Mr. Fernandez is handsomely compensated in this role.  Mr. Fernandez and Intrepid's A&D team service and work with Intrepid's coverage investment bankers to manage

and execute A&D transactions for Intrepid clients, which are assigned to the team by Intrepid management.  These client relationships have been cultivated and developed over time through the effort and expense of Intrepid's CEO and COO since Intrepid's founding.

3.      Mr. Fernandez also routinely attends meetings with the heads of Intrepid's business units, during which he obtained highly confidential information relating to every one of Intrepid's business lines.

4.      By virtue of the aforementioned role, Mr. Fernandez is privy to Intrepid's highly sensitive, confidential information concerning every aspect of Intrepid's A&D business line, which is unique to the highly specialized energy sector, including its employee and customer information, business strategies, target markets, and pricing formulae.  He has also obtained detailed knowledge of other aspects of Intrepid's business, including its past and projected financial performance, active client transactions, planned future transactions, and proprietary investments.

5.      To protect its interests and confidential information, Intrepid entered into a Non-Competition and Confidentiality Agreement ("Agreement") with Mr. Fernandez setting forth certain non-competition, non-solicitation, and non-disclosure obligations to Intrepid.  Pursuant to the Agreement, Mr. Fernandez agreed that for six months following the termination of his employment with Intrepid, he would not directly or indirectly engage in any employment, consulting or other activity that directly or indirectly competes with Intrepid's business.  He also agreed that for six months following the termination of his employment with Intrepid, he would not directly or indirectly solicit any Intrepid employees to leave the employ of Intrepid.  Further, Mr. Fernandez agreed not to use or disclose Intrepid's confidential information.

6.      On September 2, 2020, Mr. Fernandez advised his supervisor and Intrepid's Co-

Founder, Christopher Winchenbaugh, that he would be resigning from Intrepid.  Over the next several months, Mr. Fernandez engaged in numerous conversations with Intrepid representatives regarding his intended departure, but he refused to provide them with the identity of his new employer and intended start date.

7.     Despite Intrepid's pleas over the next several months for Mr. Fernandez to remain employed at Intrepid, including offers to enhance his compensation and notwithstanding its warnings to Mr. Fernandez that pursuing employment with one of Intrepid's competitors would violate his post-employment obligations, it was revealed to Intrepid through a press announcement on or around November 13, 2020 that Mr. Fernandez had decided to pursue employment with Citi, and more specifically with its A&D group, one of Intrepid's direct competitors.

8.     In the same news release, Intrepid also learned that Robert Willis, a member of Mr. Fernandez's A&D team at Intrepid, would be joining Mr. Fernandez at Citi.

9.     Mr. Fernandez's actions blatantly violate his post-employment covenants and obligations to Intrepid.  Intrepid therefore seeks injunctive relief to specifically enforce the contract, to protect its legitimate interests, and to prevent further irreparable harm.

## I.     PARTIES

10.     Claimant Intrepid is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

11.      Respondent Antonio Fernandez is a citizen of Texas who is domiciled and resides at 610 East 7th Street, Houston, Texas 77007.  Mr. Fernandez is an Associate Person with a FINRA member firm and his CRD number is: 6322715.

## II.   JURISDICTION

12.   Pursuant to the parties' Non-Competition and Confidentiality Agreement, dated July 24, 2018 ("Agreement"):

> any dispute, controversy or claim between Executive and the Company arising out of or relating to or concerning the provisions of this Agreement, or any agreement between Executive and the Company relating to or arising out of Executive's employment with the Company or otherwise concerning any rights, obligations or other aspects of Executive's employment relationship in respect of the Company ("Employment Related Matters"), shall be finally settled by arbitration in New York City before, and in accordance with the rules of the New York Stock Exchange ("NYSE") . . . .

(Agreement, ¶ 14.)

13.   A copy of the Agreement and corresponding offer letter to Mr. Fernandez is attached as Exhibit A.

## III. EVENTS GIVING RISE TO THIS ACTION

### A.  Intrepid's Operations

14.   Intrepid is an independent merchant bank founded in 2015 to leverage the market-leading energy sector and capital-raising expertise and relationships of its principals to create long-term value and investment opportunities for select clients and investors.

15.   Intrepid provides a full complement of advisory and investment services, and invests its own capital alongside its clients to unlock unique opportunities.  It offers strategic mergers and acquisitions, asset acquisition and divestiture, as well as restructuring advisory services plus access to investment opportunities across the spectrum of private equity, mezzanine and distress situations.

16.   Intrepid exclusively focuses on the U.S. energy sector.

17.   Intrepid has a total of 47 employees located in its Houston and New York offices.

**B. Respondent's Employment With Intrepid**

18.     Mr. Fernandez is one of Intrepid's senior executives, serving since 2018 as

Managing Director and Intrepid's Head of A&D.  Mr. Fernandez reports directly to Intrepid's

Co-Founders:  Christopher F. Winchenbaugh, President and Chief Operating Officer, and Hugh

"Skip" McGee, Chief Executive Officer.

19.     Mr. Fernandez supervises a team of three professionals, all of whom he recruited.

20.     By letter dated July 24, 2018, Mr. Fernandez was offered his Managing Director

position, with a start date of September 24, 2018.  The letter provided that Mr. Fernandez would

be a full-time, salaried employee and outlined his substantial compensation package which

included: a $███████ base salary, possible participation in Intrepid's profit sharing plan, a

discretionary bonus and a "make whole bonus."

21.     Attached to the offer letter was the Agreement, which contains certain post-

employment obligations.  For example, the Agreement contains narrowly tailored post-

employment restrictive covenants designed to protect Intrepid's Confidential Information, which

is defined as follows:

> [A]ll non-public information of and about [Intrepid], including, without limitation,
> business activities, business plans, strategies, legal affairs, organizational and
> personnel matters, existing and potential customers, customer information,
> contracts and agreements with customers, strategies, pending and proposed
> acquisitions, intellectual property, trade secrets, operational and hiring matters,
> personnel policies, market studies and forecasts, competitive analysis, regardless of
> the form in which such information is stored.

(Agreement, ¶ 2(c).)

22.     The Agreement likewise prohibits the disclosure of Confidential Information.

Indeed, by virtue of executing the Agreement, Mr. Fernandez agreed as follows:

> The Executive shall not, while an employee of [Intrepid], or following termination
> of his employment, directly or indirectly, use, disclose or permit to be known, other

5

than (i) as is reasonably required in the regular course of his duties on behalf of [Intrepid] . . . (ii) as required by law; . . . or (iii) with the prior written consent of [Intrepid's] Chief Executive Officer, to any person, firm or corporation any Confidential Information.

(*Id.* ¶ 3(a).)

23.     Mr. Fernandez further agreed to certain non-competition restrictions by executing the Agreement.  More specifically, the Agreement required that Mr. Fernandez provide three months' notice prior to leaving his position with Intrepid.  (*Id.* ¶ 4(a).)

24.     Mr. Fernandez further agreed that in the event of his voluntary resignation, he would not, for six months following the termination of his employment with Intrepid:

. . . directly or indirectly, whether as an owner, partner, executive, director, consultant, contractor, advisor, agent, employee, guarantor, surety, or otherwise, or through any person, consult with or in any way aid or assist any person to engage or attempt to engage in any employment, consulting or other activity which directly or indirectly competed with the current business of [Intrepid] or business under development by [Intrepid] (the "Restricted Field").

(*Id.*)

25.     "Restricted Field" includes, but is not limited to, any business enterprise that is engaged in "(i) investment banking or securities activities or financial services, including without limitation, private equity, hedge fund, or other asset management business, or (ii) any business activities in which [Intrepid] and/or any of its affiliated are engaged primarily or in any substantial manner."  (*Id.*)

26.     Additionally, Mr. Fernandez agreed that in the event of his voluntary resignation, he would not, for six months following the termination of his employment with Intrepid:

. . . directly or indirectly, on behalf of any party or person other than [Intrepid], solicit or induce (or assist or provide information in connection therewith) any then-current employee, or person who was an employee or officer of [Intrepid] within the previous six-month period, to leave the employ of [Intrepid].

(*Id.* ¶ 4(c).)

6

27.     Further, upon executing the Agreement, Mr. Fernandez acknowledged that "the foregoing non-competition and non-solicitation provisions are necessary and reasonable." (*Id.* ¶ 5.)

28.     Mr. Fernandez signed both the offer letter and the Agreement, confirming his acceptance of the terms and conditions set forth in the documents.

29.     In addition, in an e-mail to Mr. Winchenbaugh dated July 25, 2018, Mr. Fernandez specifically acknowledged that the "3 month notice period + 6 month non-compete" was a part of the deal associated with his accepting employment with Intrepid, which he discussed at length with Mr. Winchenbaugh and likewise further reflected upon before accepting employment with Intrepid.

### C. Intrepid's Confidential And Proprietary Information

30.     In his role as Managing Director and Head of A&D, Mr. Fernandez is responsible for the A&D business line at Intrepid.  Prior to hiring Mr. Fernandez, Intrepid did not have A&D capabilities.  Mr. Fernandez was hired to lead the A&D business line, run it, build a team and work in partnership with Intrepid's coverage investment bankers to service Intrepid clients' A&D needs.

31.     A&D businesses are unique to the energy sector, since their sole focus is on the geological, geotechnical and engineering evaluation of, and valuation of, energy assets in general, and, usually, oil and gas assets in particular.

32.     Specifically, members of A&D teams are usually trained petroleum engineers, geologists and geophysicists, virtually all of whom have advanced degrees in their area of specialty, and virtually all of whom have spent time working in the energy industry for large energy companies.

33.     The teams use specialized software, mapping programs and hardware unique to the evaluation of oil and gas assets.  The specific skills that members of A&D teams have developed and utilize are only of value to firms that are involved in the energy industry, and are of no value to a financial services firm unless that firm covers the energy sector and intends to pursue A&D transactions.

34.      In his aforementioned role, Mr. Fernandez has access to highly confidential and proprietary information concerning every aspect of Intrepid's A&D business line, its employees, customers and business strategy and Intrepid's operations, business activities, target markets, products, pricing formulae and business strategy.  In particular, Mr. Fernandez has detailed information including Intrepid's existing and potential A&D customers, their transactions (past, present and anticipated), needs, financial resources, investment strategies and business plans.

35.     In his aforementioned role, Mr. Fernandez interacted directly with the most senior officers of Intrepid's clients.  Fernandez also plays an active role working closely with Mr. McGee and Mr. Winchenbaugh on Intrepid's long-term business planning.  On a quarterly basis, Fernandez participated in meetings with Mr. McGee, Mr. Winchenbaugh and the heads of Intrepid's other business units.

36.      In advance of the meetings, Mr. Fernandez both prepared and was provided with written business plans and other materials marked "Confidential" that contained detailed information concerning the activities and performance of every Intrepid business line, the various projects that Intrepid's business lines were involved in, and detailed information concerning Intrepid's assets and investments.

37.     During those meetings, participants discussed Intrepid's past and projected financial performance, active client transactions, planned future transactions and strategies for

expanding Intrepid's business.

38.     As a result of his broad access to information, Mr. Fernandez has intimate knowledge of dozens of currently active transactions, the performance of the firm, its advisory business, its investment business and the performance of the A&D team he managed.

39.     Mr. Fernandez has been working on several critical projects for Intrepid clients. As a result, he has detailed knowledge concerning their needs, including their short- and long-term plans.  If shared with a competitor, the information he possesses concerning active projects, including proprietary investments, would place Intrepid at a severe competitive disadvantage.

40.     Intrepid's confidential and proprietary business information is not available to the public, is of great value to Intrepid, and would give any of its competitors who acquired such information an unfair competitive advantage.

### D.  Respondent's Resignation And Imminent Departure

41.     On September 2, 2020, Mr. Fernandez called Mr. Winchenbaugh to advise that he would be resigning from his employment.  Mr. Winchenbaugh asked Mr. Fernandez if he had accepted a position at another company, to which he responded that he did not have anything definitive.

42.     During this meeting, Mr. Fernandez stated that he decided to leave Intrepid because of his compensation.  Mr. Winchenbaugh responded that they should discuss his compensation and that if compensation was his issue, they could deal with that.  Mr. Winchenbaugh told Mr. Fernandez that he would follow up with Mr. McGee and that they should continue the conversation.  Mr. Fernandez agreed.

43.     After the call on September 2, 2020, Mr. Fernandez sent Mr. Winchenbaugh an e-mail which attached his letter of resignation.  In the letter, Mr. Fernandez referenced his

"notice period" and his request for a waiver of a portion of that notice period.

44.     Over the next few weeks, Messrs. Fernandez, Mr. McGee, and Mr. Winchenbaugh engaged in numerous conversations, via telephone, e-mail, and in-person, regarding whether Mr. Fernandez would consider staying at Intrepid in exchange for certain compensation enhancements.  These conversations continued, because Mr. Fernandez indicated that he would consider staying at Intrepid for an increase in compensation.

45.     On September 21, 2020, Messrs. McGee and Winchenbaugh had a videoconference with Mr. Fernandez.  Mr. Fernandez stated that he still intended to resign and would not accept Intrepid's offer.  He expressed a willingness to discuss his transition, but he refused to indicate where he was pursuing new employment.

46.     Pursuant to the three-month notice period the parties agreed to in the Agreement, Mr. Fernandez's employment with Intrepid terminates on November 30, 2020.

47.     On September 22, 2020, Mr. Winchenbaugh received an unsolicited letter from an attorney purporting to represent Mr. Fernandez.  The letter also challenged the enforceability of the Agreement.

48.      Intrepid then retained counsel, who responded on September 29, 2020 to the letter from Mr. Fernandez's counsel.

49.     On October 2, 2020, Mr. Willis emailed Messrs. McGee and Winchenbaugh with his letter of resignation.  Pursuant to his non-compete agreement, Mr. Willis' employment with Intrepid terminates on December 30, 2020.

50.     On November 12, 2020, it was brought to Intrepid's attention from clients that Citi informed them that Mr. Fernandez would be leaving Intrepid and joining Citi.

51.     On November 13, 2020, Intrepid found out by news release, that Messrs.

Fernandez and Willis would be joining Citi's A&D group.

52.     Following the news release, Mr. Winchenbaugh spoke to Mr. Fernandez about his exit logistics and anticipated employment start-date with Citi.  When asked, Mr. Fernandez refused to provide a date and refused to confirm that he intended to comply with the Agreement's six-month non-compete.

53.     Following the news release, Mr. Winchenbaugh spoke to Mr. Willis about his exit logistics and anticipated employment start-date with Citi.  When asked, Mr. Willis refused to provide a date and refused to confirm that he intended to comply with the Agreement's six-month non-compete.

54.     On or around November 16, 2020, Mr. McGee sent a letter to Citi's Vice Chairman and Global Head of Energy, Stephen Trauber, informing Mr. Trauber of Mr. Fernandez's and Mr. Willis' respective post-employment obligations and requesting a formal response by November 18, 2020.  As of the filing of this claim, Intrepid has not received a formal response from Citi.

## COUNT I: BREACH OF CONTRACT

55.     Intrepid hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 54.

56.      The Agreement that Mr. Fernandez entered into with Intrepid constitutes a valid and enforceable contract.

57.      Intrepid performed all of the duties and obligations it agreed to and owed Mr. Fernandez under the Agreement.

58.     The post-employment activity restrictions in the Agreement are reasonable in both scope and duration, and are necessary to protect Intrepid's interest in its confidential business

information, customers, goodwill and other legitimate business interests.

59.     By joining Citi during the six-month period following the termination of his Intrepid employment on November 30, 2020, Mr. Fernandez will be in breach of his non-competition obligations owing to Intrepid by commencing employment with a direct competitor, and posing imminent and irreparable injury to Intrepid, its confidential information and critical client relationships that Intrepid assigned to Mr. Fernandez.

60.     Upon information and belief, Mr. Fernandez also breached, and continues to breach, the Agreement by soliciting other Intrepid employees to work for Intrepid's direct competitor.

61.     As a result of Mr. Fernandez's breaches of the Agreement, Intrepid has been irreparably injured and continues to face irreparable injury.  Intrepid is threatened with losing the value of its confidential and proprietary information, customer relationships and goodwill.

## COUNT II: BREACH OF FIDUCIARY DUTY

62.     Intrepid hereby repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1 through 61.

63.     At all relevant times, Fernandez held a position of trust, confidence and responsibility at Intrepid.

64.     As a consequence, Mr. Fernandez owed and continues to owe fiduciary duties to Intrepid, and is required to act with the highest degree of loyalty and good faith toward Intrepid in all manners affecting its business, and not to take any actions that are or may be harmful to Intrepid's business.

65.     By engaging in the conduct alleged herein and acting to advance his own individual interests at Intrepid's expense, Mr. Fernandez breached his fiduciary duties owed to

Intrepid.

66.     As a result of such conduct, Intrepid has suffered and will suffer damages in an amount as yet unascertainable and to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Intrepid seeks judgment in its favor and an Order against Respondent that grants the following relief:

1.  A permanent injunction, in accordance with the Non-Competition and Confidentiality Agreement between the parties, dated July 24, 2018, that enjoins Respondent, from, directly or through others:

    A.  Directly or indirectly using, disclosing, or permitting to be known Intrepid's Confidential Information[1];

    B.  Directly or indirectly removing from Intrepid's premises, or make any copies of, Confidential Information;

    C.  Directly or indirectly, whether as an owner, partner, executive, director, consultant, contractor, advisor, agent, or employee, guarantor, surety or otherwise, or through any person, consulting with or in any way aiding or assisting any person to engage or attempt to engage in any employment, consulting, or other activity which directly or indirectly competes with the current business of Intrepid or business under development by Intrepid (the "Restricted Field")[2], for the period commencing December 1, 2020 through June 1, 2021;

    D.  Directly or indirectly, on behalf of any party or person other than Intrepid, soliciting or inducing (or assisting or providing information in connection

---

[1] "Confidential Information" means "all non-public information of and about [Intrepid], including, without limitation, business activities, business plans, strategies, legal affairs, organizational and personnel matters, existing and potential customers, customer information, contracts and agreements with customers, strategies, pending and proposed acquisitions, intellectual property, trade secrets, operational and hiring matters, personnel policies, market studies and forecasts, competitive analysis, regardless of the form in which such information is stored." The term "Confidential Information" also includes "any Confidential Information of any client, investor corporate partner, or joint venture of [Intrepid], or any other third party that [Intrepid] is required by agreement to keep confidential." (Non-Competition and Confidentiality Agreement, § 2(c)).

[2] "Restricted Field" includes, but is not limited to, "any business enterprise that is engaged, or owns or controls a significant entity that is engaged in any place in the world in (i) investment banking or securities activities or financial services, including without limitation, private equity, hedge fund, or other asset management business, or (ii) any business activities in which [Intrepid] and/or any of its affiliated are engaged primarily or in any substantial manner." (Non-Competition and Confidentiality Agreement, § 4(a)).

therewith) any then-customer of the Company or prospective customer of the Company to provide any product, service, or business that is competitive with or substantially similar to any product, service, or business then offered or planned to be offered by Intrepid, or to induce such then-customer or prospective customer to reduce or diminish the volume or level of their business with Intrepid, for the period commencing December 1, 2020 through June 1, 2021; and

E. Directly or indirectly, on behalf of any party or person other than Intrepid, soliciting or inducing (or assisting or providing information in connection therewith) any current employee, or person who was an employee or officer of Intrepid within the period June 1, 2020 through November 30, 2020, to leave the employ of Intrepid, for the period commencing December 1, 2020 through June 1, 2021.

2. Awarding Intrepid actual, incidental, compensatory and consequential damages to be proven at trial for its breach of contract and breach of fiduciary duty claims;

3. Awarding Intrepid punitive or exemplary damages to be proven at trial due to Mr. Fernandez's willful, egregious, and malicious conduct;

4. Awarding Intrepid its costs and expenses incurred herein, including reasonable attorneys' fees and interest; and

5. Awarding Intrepid such further relief as the tribunal deems necessary, just, and equitable.

Date:  New York, New York
       November 20, 2020

BAKER & HOSTETLER LLP

/s/ John Siegal
John Siegal
Tiffany A. Miao
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Email: jsiegal@bakerlaw.com
Email: tmiao@bakerlaw.com

*Attorneys for Claimant*

14

Exhibit A



1201 Louisiana Street, Suite 600
Houston, TX 77002
713.292.0863

540 Madison Avenue, 25th Floor
New York, NY 10022
212.388.5020

www.intrepidfp.com

Mr. Antonio Fernandez
610 E 7th Street
Houston, Texas 77007

July 24, 2018

Dear Tony,

Intrepid Financial Partners, L.L.C. (the "**Company**") is very pleased to offer you the position of Managing Director, reporting directly to the Members of the Company with an anticipated start date of September 24, 2018, or otherwise agreed upon. Your responsibilities will be those periodically described to you and consistent with that of a Managing Director at a financial services firm.

As a full-time, salaried employee you will receive an annual salary of $⬛⬛⬛, subject to tax and other withholdings as required by law. Such salary may be adjusted from time to time in the sole discretion of the Company and will be paid in substantially equal instalments and pro-rated for the partial year in accordance with the standard payroll practices of the Company. This is an exempt position and you are not eligible for over-time. You are eligible to receive total compensation with a target not less than $⬛⬛⬛ for calendar year 2018, less any salary earned at your current employer for calendar year 2017; provided, however, that the Company reserves complete discretion to determine whether any discretionary bonus will be paid and, if paid, the amount and timing of such bonus payment.

In addition to your salary, at the Company's sole discretion, you may be eligible to participate in the Company's long-term profit sharing plan that will entitle you to share in a portion of the future profits of the Company, if any. The terms and conditions of any such profit sharing plan will be determined in the Company's sole discretion and communicated to you under separate cover.

The Company will also pay you an additional "make-whole bonus" to replace the deferred bonus you forfeited, if any, on termination of your current employment. The make-whole bonus amount will be equal to ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, plus ⬛⬛⬛⬛⬛⬛⬛⬛⬛. The ⬛⬛⬛⬛⬛⬛⬛ will be calculated using ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. The make-whole bonus will also include an additional $⬛ related to ⬛⬛⬛⬛⬛. Such make-whole bonus will be paid on the following schedule: ⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. Such make-whole bonus will be paid at the time your discretionary bonus is paid, and is subject to you providing a copy of the applicable bonus statements/award letters. If your employment terminates with the company prior to the applicable payment date, then you will forfeit the right to any remaining make-whole bonus.

You will be entitled to 20 days of paid time-off per calendar year, in accordance with Company policies as are in effect from time to time. You will be entitled to receive health, dental and other benefits in connection with your employment with the Company, subject to and in accordance with applicable plan documents. These plans may be amended or terminated at the Company's sole discretion. You will be subject to all applicable employment and other policies of the Company.

The Company may, at its sole discretion, terminate your employment by giving you not less than three months prior written notice of such termination. You may terminate your employment by giving the Company three months prior written notice of such termination. In either event, the Company may elect, at its sole discretion, to waive or reduce the notice period. During your notice period, the Company may elect to place you on paid leave for any or all of the notice period.

This letter, along with the attached Non-Competition and Confidentiality Agreement, set forth the terms of your employment with the Company and supersede any prior representations or agreements whether written or oral.

In addition to accepting the terms and conditions set forth above, by accepting this offer:

- You agree to devote your full business time, attention and best efforts to the performance of your duties and to the furtherance of the Company's interests.

- You represent that you are not bound by any employment contract, restrictive covenant or other restriction preventing you from entering into employment with or carrying out your responsibilities for the Company, or which is in any way inconsistent with the terms of this letter.

- You represent that you will  not remove or take any documents, proprietary data or material of any kind, electronic or otherwise, with you from your current or former employer without written authorization from your current or former employer.

- You agree to provide to the Company, within three days of your hire date, documentation of your eligibility to work in the United States, as required by the Immigration Reform and Control Act of 1986.

- You agree that this offer of employment as well as your continued employment is subject to and conditioned on your successful completion of drug screening, satisfactory background check and compliance with any applicable securities industry licensing and regulatory requirements.

If you agree with and accept the terms of this offer of employment, please sign below and return this letter to me.  If not accepted, this offer shall expire in one week, but please contact us if you need more time to make a decision.  We are pleased to have you join our team, and we look forward to our success together.

2

I look forward to hearing from you.

Yours sincerely,

Intrepid Financial Partners, L.L.C.

_____
Christopher F. Winchenbaugh, Member

I accept this offer of employment on the terms and conditions set forth above.

_____
Antonio Fernandez

Date: ___7/24/18_____



1201 Louisiana Street, Suite 600
Houston, TX 77002
713.292.0863

540 Madison Avenue, 25th Floor
New York, NY 10022
212.388.5020

www.intrepidfp.com

## NON-COMPETITION AND CONFIDENTIALITY AGREEMENT

**THIS AGREEMENT** (the "Agreement"), is made and entered into as of July 24, 2018 by and between Intrepid Financial Partners, L.L.C.,  a Delaware limited liability company (the "Company"), and Antonio Fernandez (the "Executive").

### Recitals

**WHEREAS**, the Company has made an offer of employment to the Executive, subject to and conditioned on execution of this Agreement; and

**WHEREAS**, the Executive will receive substantial economic payments and benefits as a result of his employment with the Company; and

**WHEREAS**, in his capacity as a Managing Director of the Company,  the Executive will have access to the Company's business activities, goodwill, business plans, personnel and other confidential and proprietary information including, but not limited to, existing and potential customers, customer information, target market areas, strategies, methods, techniques and other information of and about the Company, all of which are of great value to the Company and which are not generally known and are confidential; and

**WHEREAS**, the Executive, in consideration of the Company's offer of employment, as set forth in the Offer letter of the date hereof, accepts the terms and conditions set forth in this Agreement.

### Agreement

**NOW, THEREFORE**, in consideration of the above referenced recitals and the mutual covenants and promises therein and herein contained and the substantial benefits provided under the Offer Letter, the receipt and sufficiency of which is acknowledged, and intending to be legally bound, it is hereby agreed by and between the parties as follows:

1. **Term**. This Agreement shall commence upon Executive's employment with the Company.

2. **Unique Position of Trust.**
(a) Executive acknowledges that he will render services to the Company that are of a special and unusual character, with a unique value to the Company. Executive also acknowledges that he will hold a position of trust in which he has had and will have broad access to all of the Company's most sensitive Confidential Information (as defined below).

(b) For purposes of this Agreement, "Company" shall mean Intrepid Financial Partners, L.L.C. and, any other business entity that is either controlled by, controls, or is under common control with Intrepid Financial Partners, L.L.C.

(c) For purposes of this Agreement, "Confidential Information" means all non-public information of and about the Company, including without limitation, business activities, business plans, strategies, legal affairs, organizational and personnel matters, existing and potential customers, customer information, contracts and agreements with customers, strategies, pending and proposed acquisitions, intellectual property, trade secrets, operational and hiring matters, personnel policies,

market studies and forecasts, competitive analyses, regardless of the form in which such information is stored. "Confidential Information" shall also include any Confidential Information of any client, investor, corporate partner, or joint venturer of the Company, or any other third party that the Company is required by agreement to keep confidential. "Confidential Information" shall not, however, include information that the Executive can demonstrate (a) has become publicly known through no act of the Executive, (b) has been rightfully received by the Executive from a third party not subject to any confidentiality agreement concerning such information or (c) has been independently developed by the Executive without use of or reliance on Confidential Information or any violation of his obligations under this Agreement. If a particular portion or aspect of Confidential Information becomes subject to any of the foregoing exceptions, all other portions or aspects of such information shall remain subject to all of the provisions of this Agreement.

3. **Protection of Company Confidential Information.**
(a) The Executive shall not, while an employee of the Company, or following termination of his employment, directly or indirectly, use, disclose or permit to be known, other than (i) as is reasonably required in the regular course of his duties on behalf of the Company, including disclosures to the Company's advisors and consultants, (ii) as required by law (in which case the Executive shall give the Company prior written notice of such required disclosure, unless said notice to the Company is prohibited by judicial order) or (iii) with the prior written consent of the Company's Chief Executive Officer, to any person, firm or corporation any Confidential Information.

(b) The Executive shall not remove from the Company's premises, or make any copies of, Confidential Information, except as necessary to perform or use in the course of legitimate Company business. The Executive agrees to return to the Company all Confidential Information and Company property, including all copies of it, in his possession or under his control, (i) at any time upon the request of the Company, and (ii) without such a request at the termination of his employment by the Company.   Upon the Company's request, the Executive will furnish a written statement that he has returned all Confidential Information and property to the Company.

(c) Executive and Company agree that this Agreement does not limit his/her ability to communicate with the Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company.

4. **Non-Competition and Non-Solicitation.**
(a) In view of the unique value to the Company of the services of the Executive, because of the Confidential Information of the Company entrusted to or obtained by the Executive, and as a material inducement to the Company to enter into the Offer Letter with Executive, pursuant to which the Executive will receive significant benefits, the Executive covenants and agrees that he shall not (i) in the event that his termination is either for Cause or his voluntary resignation, then for six (6) months from the Termination  Date (which shall be the date of termination of employment, following the Notice Period) or (ii) in the event his termination is without Cause

2

then for the Notice Period, if any (such applicable time period in clauses (i) or (ii) shall be  the "Restricted Period"), directly or indirectly, whether as an owner, partner, executive, director, consultant, contractor, advisor, agent, employee, guarantor, surety or otherwise, or through any person, consult with or in any way aid or assist any person to engage or attempt to engage in any employment, consulting or other activity which directly or indirectly competes with the current business of the Company or business under development by the Company (the "Restricted Field"). The "Notice Period" shall be the period of time as set forth in the Executive's offer letter with the Company to the extent not otherwise waived by the Company in its sole discretion.  The Restricted Field includes, but is not limited to, any business enterprise that is engaged, or owns or controls a significant entity that is engaged in any place in the world in (i) investment banking or securities activities or financial services, including, without limitation, private equity, hedge fund or other asset management business, or (ii) any business activities in which the Company and/or its affiliates are engaged primarily or in any substantial manner. The Executive acknowledges that his participation in the conduct of any such business or activity alone or with any person other than the Company will materially impair the business and prospects of the Company and the goodwill of the Company.

(b) In the event that Executive's termination is either for Cause or his voluntary resignation, then for six (6) months from the Termination  Date (which shall be the date of termination of employment, following the Notice Period) or  (ii) in the event his termination is without Cause, then for six (6) months from the Executive's Termination Date, the Executive shall not, directly or indirectly, on behalf of any party or person other than the Company, solicit (or assist or provide information in connection therewith) any then-customer of the Company or prospective customer of the Company to provide any product, service, or business that is competitive with or substantially similar to any product, service, or business then offered or planned to be offered by the Company, or to induce such then-customer or prospective customer to reduce or diminish the volume or level of their business with the Company.

(c) In the event that Executive's termination is either for Cause or his voluntary resignation, then for six (6) months from the Termination  Date (which shall be the date of termination of employment,  following the Notice Period) or  (ii) in the event his termination is without Cause, then for six (6) months from the Executive's Termination Date, the Executive shall not, directly or indirectly, on behalf of any party or person other than the Company, solicit or induce (or assist or provide information in connection therewith) any then-current employee, or person who was an employee or officer of the Company within the previous six-month period, to leave the employ of the Company.

(d) For purposes of this Agreement, "Cause" shall mean the Company's determination that the Executive has (i)  breached any material agreement with Company or materially violated any  Code of Conduct or written policy of the Company, (ii) been convicted, indicted or entered a plea of guilty or *nolo contendere* to any felony, (iii) willfully and continually failed to perform his duties, (iv) engaged in willful misconduct that resulted in material harm to the Company  or (iv)  knowingly violated  any securities laws or regulations.

(e)  Nothing herein shall preclude the Executive from beneficially owning no more than two percent (2%) of the total outstanding stock of a class of stock registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

5. **Reasonableness.** Executive acknowledges and agrees the foregoing non-competition and non-solicitation provisions are necessary and reasonable, and that it has been made clear to the Executive that the Executive's compliance with Sections 3 and 4 of this Agreement is a material condition to the Company's offer of employment, and subsequent employment of the Executive pursuant to the Offer Letter. The Executive further acknowledges and agrees that, if the Executive breaches Sections 3 and 4 of this Agreement, the restricted periods set forth therein shall be tolled during the time of such breach.

6. **Remedies.** In the event of an actual breach by the Executive of the provisions of Sections 3 and 4 of this Agreement, the Company shall be entitled to terminate the Executive's employment for cause and suspend any payments and provision of benefits that the Executive may be entitled to pursuant to the Offer Letter or otherwise, including the payment of any deferred compensation, bonus or other incentive compensation (whether vested or unvested), and to entry of an injunction restraining the Executive from such breach without any obligation to post a bond and without proving special damages or irreparable injury and the Executive acknowledges and agrees that any such breach or threatened breach will cause irreparable injury to the Company and that money damages will not provide an adequate remedy to the Company. Nothing herein, however, shall be construed as prohibiting the Company from pursuing any other remedies available to the Company for such breach or threatened breach. In the event of any action by the Company to enforce this Agreement, the non-prevailing party shall be responsible for paying the reasonable attorneys' fees and expenses, including paralegal fees of the prevailing party.  If the Executive violates any of the covenants contained in Sections 3 and 4 of this Agreement the terms and the covenants violated shall be automatically extended to a like period of time from the date on which the Executive ceases such violation or from the date of entry by a court of competent jurisdiction of any order or judgment enforcing such covenant, whichever period is later. To the extent permitted under applicable law and without limiting the right to terminate payments herein, the Company may suspend any payments or benefits that the Executive may be entitled to pursuant to the Offer letter or otherwise for the duration of any period in which the Company reasonably determines that the Executive is in breach hereof. The provisions of Sections 3, 4, and 5 and this Section 6 shall survive the termination of this Agreement.

7. **Notices.** Any notice or other communication in connection with this Agreement shall be delivered to the other party either via overnight mail or certified mail.

8. **Waiver of Breach**. The waiver by either party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by the other party.

9. **Entire Agreement; Amendment.** The recitals hereto are hereby incorporated herein by this reference. This Agreement, together with the Offer Letter attached hereto, constitute the entire agreement between the parties hereto with regard to the subject matter hereof and thereof, superseding all prior understandings and agreements, whether written or oral.

10. **Non-Exclusivity of Rights**. Except as otherwise expressly provided herein, nothing in this Agreement shall prevent or limit the Executive's continuing or future participation in any benefit, deferred compensation, bonus, incentive or other plan or program provided by the Company and for which the Executive may qualify, nor shall anything herein limit or reduce such rights as the Executive may have under any other agreements with the Company Amounts which are vested benefits or which the Executive is otherwise entitled to receive under any plan or program of the

Company shall be payable in accordance with such plan or program, except as explicitly modified by this Agreement.

11. **Interpretation**. The parties agree and acknowledge that this Agreement shall be deemed drafted equally by both of the parties. Its language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language shall be construed against any party shall not apply.

12. **Effect of Headings.** The titles of section headings herein contained have been provided solely for convenience of reference and in no way define, limit or describe the scope or substance of any provision of this Agreement.

13. **Severability**. The provisions of this Agreement are severable, and the invalidity of any provision shall not affect the validity of any other provision. In the event that any court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

14. **Arbitration**. Subject to the provisions of Section 6 hereof, any dispute, controversy or claim between Executive and the Company arising out of or relating to or concerning the provisions of this Agreement, or any agreement between Executive and the Company relating to or arising out of Executive's employment with the Company or otherwise concerning any rights, obligations or other aspects of Executive's employment relationship in respect of the Company ("Employment Related Matters"), shall be finally settled by arbitration in New York City before, and in accordance with the rules of the New York Stock Exchange ("NYSE") or, if the NYSE declines to arbitrate the matter, the American Arbitration Association (the "AAA") in accordance with the commercial arbitration rules of the AAA.

15. **Governing Law/Jurisdiction**. This Agreement shall be binding upon the Executive and shall inure to the benefit of the Company and its successors and interest and assigns, and shall be construed in accordance with and governed by the laws of the State of New York without regard to conflicts of laws. Notwithstanding the provisions of Section 14, and in addition to its right to submit any dispute or controversy to arbitration, the parties hereto intend and hereby confer jurisdiction to enforce the covenants contained herein upon the state and federal courts sitting in the City of New York. This includes any suit, action of proceeding to compel arbitration. In the event that such courts, or an arbitrator, shall hold any such covenant wholly unenforceable by reason of the breadth of scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the Company's right to the relief provided above in the courts of any other states within the geographical scope of such other covenants having appropriate personal and subject matter jurisdiction over the parties, as to breaches of such covenants in such other respective jurisdictions, the above covenants as they relate to each state being, for this purpose, severable into diverse and independent covenants.

16. **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

[remainder of page intentionally left blank]

5

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as a binding contract as of the date first written above.

Intrepid Financial Partners, L.L.C.

_____

Christopher F. Winchenbaugh
Member


_____
Antonio Fernandez

Date: ___7|24|18_____

6