BAKER & HOSTETLER LLP
John Siegal
Tiffany A. Miao
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Email: jsiegal@bakerlaw.com
Email: tmiao@bakerlaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTREPID FINANCIAL PARTNERS, LLC, | : |
| Plaintiff, | : Case No.: 1:20-cv-09779-LTS-KHP |
| -v.- | : |
| ANTONIO C. FERNANDEZ, | : **REDACTED** |
| Defendant. | : |

I, **Hugh "Skip" McGee**, declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am Co-Founder and Chief Executive Officer of Intrepid Financial Partners ("Intrepid").  I make this declaration to submit to the Court the facts warranting entry of an order converting the Court's temporary restraining order entered on November 30, 2020 into a preliminary injunction, so that the status quo can be preserved and the rights and obligations of the parties can be determined in an arbitration before the Financial Industry Regulatory Authority.  I have personal knowledge of the facts and circumstances set forth below.

2.      I have over thirty years of experience in energy investment banking and managing investment bankers.  I spent the majority of my career with Lehman Brothers.  While there, I ran Lehman's Global Natural Resources and Power Franchises, and from 2002 to 2008, I was the Head of the Global Investment Banking Division.  Following the bankruptcy of Lehman, I joined

Barclays and brought with me over 10,000 Lehman employees.  At Barclays, I served as CEO of Corporate and Investment Banking, Americas and Chairman and Head of the Global Investment Banking Division.  Before I left Barclays to start Intrepid in 2015, I was CEO of Barclays, Americas and served as a member of the Barclays Group Executive Committee.

3.      Throughout my career, I have been involved with numerous multi-billion dollar transactions, and I have managed, trained, and mentored over thousands of bankers.

4.      Christopher Winchenbaugh and I founded Intrepid in July of 2015.  Mr. Winchenbaugh and I have known each other for almost 20 years, dating back to when we were both at Lehman.  We founded Intrepid because we saw an opportunity in the energy market at the time, and having spent the majority of our careers with larger financial institutions, we also saw an opportunity to create something new for clients—a firm that prioritized maintaining and cultivating relationships with its clients for the long-term.

5.      In order for Intrepid to succeed, we knew we needed top talent to service our clients.  We also knew that for Intrepid to be successful, we would need talent that was not only highly competent and technically skilled to do the job, but individuals that would fit with and invest in the culture at Intrepid.  By design, Intrepid takes on a more holistic approach—our Business Heads share client insights, needs, and opportunities.  This structure promotes collaboration and cross-selling between different business teams, which is to the benefit of our clients but also those who work at Intrepid.  An underlying tenet to this business model is trust and commitment amongst those who work at Intrepid.

6.      Intrepid right now only employs 46 individuals, located in Houston and New York City, and between Mr. Winchenbaugh and me, we oversee each employee.

7.     In 2018, Intrepid decided that we wanted to expand our business lines to offer Acquisitions and Divestitures ("A&D") services for our clients.

8.     Intrepid hired defendant Antonio Fernandez in September of 2018 to develop and lead the new A&D team at Intrepid.  We recognized Mr. Fernandez's talent and potential, and we were willing to make a significant investment in him and the new A&D team.

9.     A&D work can be very generally understood as the selling-off of an entities' assets.  Some of the A&D deals can be publicly known.  A company may make a public announcement that they are going to sell non-core assets and solicit proposals from four or five firms.  There are also A&D deals that are non-public.  For example, a bank may be working on a takeover defense or merger for a company and learn that the company needs to sell an asset.  The company may then ask the bank to advise them on which assets to sell.  These A&D deals involve completely material, sensitive, non-public information.

10.     Intrepid's current restructuring assignments have generated an increase in non-public A&D work.  The client information and valuation information associated with the A&D work Intrepid is performing for those clients is non-public and anyone with access to that information that leaves Intrepid and goes to a competitor can do some real damage to Intrepid.

11.     On or around September 2, 2020, Mr. Fernandez informed Intrepid that he was resigning.  I asked Mr. Fernandez where he was going and responded that he did not know.  In my 30 years of experience in energy investment banking, bankers rarely resign, especially in the September-October time period, and without knowing where they are going.

12.     Mr. Fernandez explained that he was resigning because he was unsatisfied with his compensation for the year 2019.  In 2019, Intrepid's A&D business ████████████ ████.  Mr. Fernandez did receive a bonus distribution in February and July of this year for his

2019 work.  In comparison, there were other Managing Directors that did not receive a bonus and were paid less than Mr. Fernandez.

13.     In response, I told him that compensation this year would be different because there is revenue in the business.  I suggested that he stay, and over the course of our conversations, we informed him that we would make compensation a non-issue for him.  Mr. Fernandez then discussed the proposal with Mr. Winchenbaugh and me, on-and-off, for three weeks until he ultimately decided to resign.

14.     Intrepid's compensation structure differs from the other banks.  Other banks' compensation structure includes deferred compensation and usually in the form of cash and equity that vests over multiple years.  Intrepid offers ███████████, with ███████████████ and ███████████████████.  In exchange for ███████████████████ ███████, there is a six-month non-compete that every employee at Intrepid had agree to.

15.     The rationale for the six-month non-compete is that the confidential information and trade secrets that gets shared amongst Intrepid employees, and in particular senior members, has a shelf-life of six months or longer.

16.     A&D deals, which includes preparing the data room to marketing materials, then marketing the asset, making management and technical presentations, requesting bids, contract negotiations, and taking into consideration time to close the deal, take at a minimum, six months to complete.  Transactions in Intrepid's other business lines have even longer shelf-lives.

17.     Mr. Fernandez did not only work on A&D mandates for Intrepid.  When he presented his business plan for the A&D team at Intrepid, he intended to integrate A&D work with Intrepid's other business lines, and Mr. Fernandez worked closely with the other Senior members on non-A&D work.

18.     Mr. Fernandez, who was a senior member of Intrepid's team participated in team meetings, where everyone discussed and shared confidential information about clients and deals and potential opportunities for Intrepid to pursue.  The information relating to Intrepid's potential business opportunities is confidential client information that Intrepid employees share with each other with the intent of growing Intrepid's business and better serving clients.  Intrepid employees comfortably and willingly do so, because they trust and know that their colleagues, who are the only ones who receive this information, are all bound to the same six-month non-compete.

19.     Mr. Fernandez, after gaining invaluable proprietary and confidential industry, client, and business information from Intrepid, should be bound to the six-month non-compete that he and all his Intrepid peers agreed to when they joined Intrepid.  Permitting Mr. Fernandez to commence employment with Citi's Energy and A&D department any sooner than June 1, 2021, would jeopardize Intrepid's entire business.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this __11__ day of December, 2020, in ___Houston_____, Texas.

_____
Hugh ("Skip") McGee